UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OPERATING ENGINEERS CONSTRUCTION INDUSTRY AND MISCELLANEOUS PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>v.<br><br>ITT EDUCATIONAL SERVICES, INC., KEVIN M. MODANY, and DANIEL M. FITZPATRICK,<br><br>                Defendants. | Civil Action No. 10 CIV 8323 (VM) |

**MEMORANDUM OF LAW IN SUPPORT OF THE ALASKA LABORERS-EMPLOYERS RETIREMENT TRUST'S MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND FOR APPROVAL OF ITS SELECTION OF COUNSEL**

# TABLE OF CONTENTS

|                                                                                              | Page(s) |
|----------------------------------------------------------------------------------------------|---------|
| TABLE OF AUTHORITIES                                                                         | ii      |
| PRELIMINARY STATEMENT                                                                        | 1       |
| STATEMENT OF FACTS                                                                           | 3       |
|     A. Background                                                        | 3       |
|     B. Defendants' Fraudulent Scheme                                     | 4       |
|     C. The Truth Begins to Emerge                                        | 5       |
| ARGUMENT                                                                                     | 8       |
| I. ALASKA LABORERS SHOULD BE APPOINTED LEAD PLAINTIFF                                        | 8       |
|     A. Alaska Laborers Has the Largest Financial Interest in the Relief Sought | 8 |
|     B. The PSLRA Favors The Appointment of Institutional Investors Such As Alaska Laborers | 9 |
|     C. Alaska Laborers Is Qualified Under Rule 23                        | 10      |
|         1. Alaska Laborers' Claims Are Typical of the Class Claims | 11 |
|         2. Alaska Laborers Will Fairly and Adequately Represent the Interests of the Class | 12 |
|         3. This Court Should Approve Alaska Laborers' Choice of Lead Counsel | 14 |
| CONCLUSION                                                                                   | 15      |

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.,*
No. 03 MD 1529 (LMM), 2005 WL 2126157 (S.D.N.Y. Sept. 1, 2005) ..............................10

*Albert Fadem Trust v. Citigroup Inc.,*
239 F. Supp. 2d 344 (S.D.N.Y. 2002) ..................................................................................10

*In re Cavanaugh,*
306 F.3d 726 (9th Cir. 2002) ................................................................................................14

*In re Cendant Corp. Litig.,*
264 F.3d 201 (3d Cir. 2001) .................................................................................................13

*In re Comverse Tech., Inc. Sec. Litig.,*
No. 06-CV-1825(NGG)(RER), 2007 WL 680779 (E.D.N.Y. Mar. 2, 2007) .........................8

*Constance Sczesny Trust v. KPMG LLP,*
223 F.R.D. 319 (S.D.N.Y. 2004) .........................................................................................13

*In re Crayfish Co. Sec. Litig.,*
No. 00-cv-6766, 2002 WL 1268013 (S.D.N.Y. June 6, 2002) .............................................11

*Ferrari v. Impath, Inc.,*
No. 03 Civ. 5667 (DAB), 2004 WL 1637053 (S.D.N.Y. July 20, 2004) ........................3, 13

*Glauser v. EVCI Center Colls. Holding Corp.,*
236 F.R.D. 184 (S.D.N.Y. 2006) ...........................................................................................9

*Hicks v. Morgan Stanley & Co.,*
No. 01-CIV-10071 (HB), 2003 WL 21672085 (S.D.N.Y. July 16, 2003) ...........................11

*Juliar v. Sunopta, Inc.,*
No. 08 Civ. 933 (PAC), 2009 WL 1955237 (S.D.N.Y. Jan. 30, 2009) ................................10

*Kaplan v. Gelfond,*
240 F.R.D. 88 (S.D.N.Y. 2007) ...........................................................................................10

*In re Olsten Corp. Sec. Litig.,*
181 F.R.D. 218 (E.D.N.Y. 1998) ...........................................................................................9

*In re Olsten Corp. Sec. Litig.,*
3 F. Supp. 2d 286 (E.D.N.Y. 1998) .....................................................................................10

*In re Party City Sec. Litig.,*
189 F.R.D. 91 (D.N.J. 1999) ..................................................................................................9

*Reimer v. Ambac Fin. Group, Inc.*,
   No. 08 Civ. 411(NRB), 2008 WL 2073931 (S.D.N.Y. May 9, 2008) ...................... 12

*Skwortz v. Crayfish Co., Ltd.*,
   No. 00-cv-6766 (DAB), 2001 WL 1160745 (S.D.N.Y. Sept. 28, 2001) ...................... 9

*Strougo v. Brantley Capital Corp.*,
   243 F.R.D. 100 (S.D.N.Y. 2007) .......................................................................... 9

*Weinberg v. Atlas Air Worldwide Holdings, Inc.*,
   216 F.R.D. 248 (S.D.N.Y. 2003) ........................................................................ 11

*Xianglin Shi v. Sina Corp.*,
   No. 05 Civ. 2154 (NRB), 2005 WL 1561438 (S.D.N.Y. July 1, 2005) ...................... 13

**STATUTES, RULES & OTHER AUTHORITIES**

15 U.S.C. § 78j(b) .................................................................................................... 1

15 U.S.C. § 78t(a)) ................................................................................................... 1

15 U.S.C. § 78u-4(a)(3) .................................................................................... *passim*

Fed. R. Civ. P. 23 ............................................................................................. *passim*

1 H. Newberg, *Newberg on Class Actions* § 3.13 (4th ed. 2007) .............................. 11

H.R. Conf. Rep. No. 104-369 (1995) reprinted in 1995 U.S.C.C.A.N. 730 .............. 14

The Alaska Laborers-Employers Retirement Trust ("Alaska Laborers"), through its undersigned counsel, respectfully submits this memorandum of law in support of its motion: (1) to be appointed as Lead Plaintiff pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"); and (2) for approval of its selection of the law firm of Grant & Eisenhofer P.A. ("Grant & Eisenhofer") as Lead Counsel for the Class.

## PRELIMINARY STATEMENT

Currently pending in this District is a securities class action brought pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), that alleges violations of the federal securities laws by ITT Educational Services, Inc. ("ITT" or the "Company"); its Chairman and Chief Executive Office, Kevin M. Modany; and its Chief Financial Officer, Daniel M. Fitzpatrick (collectively, "Defendants"). During the period from October 23, 2008 through August 13, 2010 (the "Class Period"), Defendants misled investors by failing to disclose that its profits were made by engaging in improper and deceptive recruiting and financial aid and lending practices. The misconduct of the for-profit educational industry drew the attention of the Department of Education (the "DOE"), the U.S. General Accounting Office (the "GAO"), and the U.S. Senate Committee on Health, Education, Labor and Pensions (the "Senate Committee"). On August 3, 2010, the GAO issued a 30-page report concluding that for-profit educational institutions such as ITT have engaged in an illegal and fraudulent course of action designed to recruit students and overcharge the federal government for the cost of such education. As detailed in the report, government investigators found that for-profit colleges encouraged fraudulent practices and misled prospective students. On August 6, 2010, ITT announced in a Form 8-K filed with the Securities and Exchange Commission (the "SEC") that it had received a request for information and documents from the Senate Committee. On August 13, 2010, the

DOE released an analysis revealing that many of the for-profit college students are not repaying school loans. Specifically, the report showed that ITT had a repayment rate of 31%. The price of ITT stock plummeted in response to this series of disclosures about the Defendants' misconduct, causing the Class to incur billions of dollars in losses.

Pursuant to the PSLRA, this Court must appoint the "most adequate plaintiff" to serve as Lead Plaintiff in this Action. 15 U.S.C. § 78u-4(a)(3)(B)(i). In so doing, the Court must consider which movant or movants have the "largest financial interest" in the relief sought by the Class, and whether there has been a *prima facie* showing that the movant is an adequate and typical class representative under Rule 23 of the Federal Rules of Civil Procedure (the "Federal Rules"). 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

Alaska Laborers respectfully submits that it is the "most adequate plaintiff," as defined by the PSLRA, because it has the largest financial interest in the relief sought in this Action and otherwise satisfies the requirements of Rule 23 of the Federal Rules. As a result of Defendants' misconduct, Alaska Laborers suffered losses of approximately $1,013,811 on either a first-in, first-out ("FIFO") basis or a last-in, first-out ("LIFO") basis.[1] By virtue of its substantial investment and losses in ITT stock during the Class Period, Alaska Laborers believes that it has the largest financial interest in the relief sought in this Action. Alaska Laborers also satisfies the adequacy and typicality requirements of Rule 23 of the Federal Rules, and fully understands the duties and responsibilities of a Court-appointed Lead Plaintiff under the PSLRA. Accordingly, Alaska Laborers is presumptively the "most adequate plaintiff" as defined by the PSLRA and should be appointed Lead Plaintiff on behalf of the Class.

---

[1] As required by the PSLRA, Alaska Laborers herewith provides a Certification that, among other things, lists its transactions in ITT common stock during the Class Period. *See* Exhibit 1 of accompanying Declaration of Daniel L. Berger, dated January 3, 2011 (hereinafter "Berger Decl."). Alaska Laborers' FIFO and LIFO losses are identical because it did not own shares before the class period. Therefore, sales were matched as they occurred against their then-existing position.

Moreover, Alaska Laborers is a sophisticated institutional investor experienced in conducting and supervising counsel in complex securities litigation, and is therefore the paradigmatic Lead Plaintiff envisioned by the PSLRA. *See Ferrari v. Impath, Inc.*, No. 03 Civ. 5667 (DAB), 2004 WL 1637053, at *3 (S.D.N.Y. July 20, 2004) (stating that institutional investors are the type of lead plaintiff that Congress wanted to encourage to participate in litigation and in the selection of plaintiff's counsel). Lastly, Alaska Laborers selected Grant & Eisenhofer, a highly qualified law firm with substantial experience in prosecuting securities class actions, to serve as Lead Counsel for the Class.

Accordingly, and for the reasons set forth in detail below, Alaska Laborers should be appointed Lead Plaintiff, and its selection of Grant & Eisenhofer as Lead Counsel for the Class should be approved.

## STATEMENT OF FACTS

### A. Background

In 1963, Howard W. Sams and Co. Inc. ("Sams"), an Indianapolis-based publisher of technical training manuals and textbooks, opened a private trade school, Sams Technical Institute. It opened another school and acquired two others and then, in 1966, it was acquired by ITT Corporation. Two years later, ITT Corporation incorporated its private school subsidiary as "ITT Educational Services", established its headquarters in Indianapolis, and went on an acquisition spree.

Today, Defendant ITT is one of the largest accredited, for-profit providers of postsecondary degree programs in the United States. As of December 31, 2009, the Company offered master, bachelor and associate degree programs to approximately 80,000 students at 125 locations (including 121 campuses and four web-based "learning sites") in 38 states. ITT is a Delaware corporation, with its executive offices located in Indiana. Its stock is publicly traded

on the New York Stock Exchange under the symbol "ESI" with almost 32 million shares outstanding.

B.  **Defendants' Fraudulent Scheme**

Throughout the Class Period, Defendants' statements and filings with the SEC presented ITT as a stable company with competent management, reliable internal controls and strong growth prospects. Defendants consistently reported increasing enrollment, student retention and net tuition pricing, which generated double-digit revenue growth, facilitated new service offerings and (it was assured) improved academic quality for students. ITT outwardly appeared to be well positioned to remain a profitable and successful business, or as ITT put it – "a leading provider of technology-oriented postsecondary degree programs."[2]

ITT's apparent success, however, was hardly the product of an astute re-investment strategy and a commitment to providing quality educational opportunities. Rather, Defendants concocted a scheme to fraudulently inflate revenues and boost profitability by exploiting well-intentioned and often lower-income students, including veterans of the U.S. armed forces, who were hoping to improve their qualifications and employment prospects. By aggressively "recruiting" and enrolling students in ITT's targeted demographic, Defendants presented a picture of burgeoning enrollment and increasing revenues, while assuring investors that it remained powerfully committed to compliance with federal Title IV student loan rules and regulations. But Defendants, in reality, were building a house of cards. Many students were lured into paying for courses through improper disclosures of tuition and costs (which were often far in excess of the cost of a traditional public or private university) and through misstatements meant to conceal the schools' poor post-graduation "gainful employment" rates. In certain

---

[2]    *See* ITT Educational Services, Inc. website, http://www.ittesi.com/phoenix.zhtml?c=94519&p=irol-newsArticle&ID=183166&highlight=.

4

instances, as was revealed at the end of the Class Period, prospective students were encouraged to falsify financial aid forms, thereby allowing ITT to tap deeper into federal student loan monies to boost its reported revenues. Indeed, the Company derives the vast majority of its revenue (more than 80% in 2009) from these loans.

Not surprisingly, students often withdrew early or failed to complete degree programs once the misleading marketing was exposed. Nevertheless, ITT continued to recognize revenue related to these early withdraws, and failed to take adequate reserves for bad debt, even though ITT itself knew it was highly unlikely that it could collect from the same low-income demographic that it had intentionally targeted. Defendants deceived investors by creating the impression that ITT was a profitable enterprise, when, in reality, its revenues and profitability were built on false promises and accounting manipulations.

### C. The Truth Begins to Emerge

ITT's share price remained artificially inflated throughout the Class Period. By August 2, 2010, ITT's stock was trading in the $82 range, but it was rocked when it was revealed during a Senate investigation and in a report submitted and presented to Senate investigators by the GAO (the "GAO Report") that ITT was committing widespread marketing fraud.

On August 3, 2010, news began to leak into the market concerning the findings from an undercover operation conducted by the GAO on recruiting techniques used in the for-profit higher education industry. As a result, on August 3, 2010, ITT stock declined $3.74, or 4.53%, from a closing price of $82.63 on August 2, 2010, to a closing price of $78.89 on August 3, 2010.

On August 4, 2010, the Senate Committee commenced hearings on for-profit education firms with blistering testimony about the "relentless" efforts of for-profit college recruiters to boost enrollment with improper tactics. According to Senator Tom Harkin, chair of the Senate

5

Committee, the fraud seemed to be "widespread in the industry," because recruiters were incentivized to pressure students to sign up for courses, and to lie to prospective students about the cost of programs and the value of degrees. The GAO Report, also released on August 4, 2010, described how government investigators, posing as applicants, were told by for-profit college recruiters that students had to sign enrollment contracts and pay fees before they could get financial aid information, and recruiters themselves were misled about the quality and cost of education companies' programs. The GAO Report stated that some recruiters directly encouraged prospective students to commit fraud on financial assistance forms and other paperwork.

Calling the fraud "systemic to the for-profit industry," Senator Harkin vowed tighter legislation and more hearings. Michael McComis, head of the Accrediting Commission of Career Schools and Colleges (which sets and enforces standards in the industry) stated "[c]learly, the GAO Report puts forth some troubling practices, and I believe those institutions need to be investigated and held accountable." Senators on the Committee were most disturbed that for-profit schools appeared to target students who can least afford to pay, including ex-military personnel, then charged much more than traditional public and private universities, leaving these students saddled with debt and the government on the hook for the bill.

On August 6, 2010, ITT announced, in a Form 8-K filed with the SEC, that it had received a request for information and documents from the Senate Committee in connection with the review of matters related to for-profit colleges receiving Title IV student financial aid. As a result of the disclosures on August 4 and August 6, 2010, the price of ITT common stock declined $4.48, or 5.94%, to close at $70.92. Adverse market reaction continued in the following days as market analysts digested the impact of these disclosures.

On August 13, 2010, the Department of Education issued a report (the "DOE Report") detailing student-loan repayment rates at the nation's colleges and universities. The data showed that the repayment rates were 54% at public colleges and universities, 56% at private non-profit institutions and 36% at for-profit colleges. Specifically, the report stated that ITT's student loan repayment rates had deteriorated to 31%. Under gainful employment regulations proposed by the DOE, ITT could lose its eligibility to receive federal financial aid with a loan repayment rate of just 31%, which would mean ITT's largest source of revenue would be wiped out.

Following the leak of the GAO report, through the release of the DOE report, and as a result of negative media and analyst coverage, the price of ITT's stock fell from $82.63 per share on August 2, 2010, to $52.95 per share on August 17, 2010, a total decline of $29.68 per share or 36%, wiping out nearly $1 billion in market capitalization. ITT's stock price has remained deflated and currently trades at around $60 per share. From its recent high of $119.20 per share on April 13, 2010, ITT's share price has declined by approximately 50%, wiping out nearly $2 billion in market capitalization.

The instant Action was filed on November 3, 2010, by the Operating Engineers Construction Industry and Miscellaneous Pension Fund. On November 3, 2010, plaintiff's counsel published notice of the pendency of its action on *Business Wire*, which provided a January 3, 2011, deadline to seek appointment as Lead Plaintiff. Berger Decl., Ex. 2. Alaska Laborers filed the instant motion for appointment of lead plaintiff within the sixty-day period set forth in the notice published by plaintiff's counsel. Accordingly, Alaska Laborers has satisfied the procedural mandates of the PSLRA, and now timely moves this Court to be appointed as the Lead Plaintiff for this Action.

# ARGUMENT

## I. ALASKA LABORERS SHOULD BE APPOINTED LEAD PLAINTIFF

Alaska Laborers respectfully submits that it should be appointed Lead Plaintiff because it is the movant "most capable of adequately representing the interests of class members." 15 U.S.C. § 78u-4(a)(3)(B)(i). The PSLRA sets forth the procedure for selecting the lead plaintiff in class actions arising under the securities laws and provides a presumption favoring the plaintiff with the largest financial interest in the action. Under the PSLRA, the Court "shall" adopt a presumption that the most adequate plaintiff is "the person or group of persons that…(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

### A.  Alaska Laborers Has the Largest Financial Interest in the Relief Sought

Alaska Laborers believes that it has the largest financial interest of any movant in this action and should therefore be appointed Lead Plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii). As a result of ITT's misconduct and the subsequent market correction of the price of ITT common stock, Alaska Laborers sustained losses of $1,013,811 on either a FIFO or LIFO basis. *See* Berger Decl. Ex. 1.

Courts commonly employ both the "FIFO" and "LIFO" methods for calculating financial interest for purposes of appointing Lead Plaintiff under the PSLRA. *See, e.g., In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825(NGG)(RER), 2007 WL 680779, at *7 n.10 (E.D.N.Y. Mar. 2, 2007) (noting that "Courts have recognized two potential accounting methods when assessing gains/losses that result from the purchase and sale of securities," and identifying FIFO

and LIFO as those methods).³ In light of its large financial interest, Alaska Laborers is entitled to the statutory presumption as the most adequate plaintiff and should be appointed Lead Plaintiff in this case.

### B. The PSLRA Favors The Appointment of Institutional Investors Such As Alaska Laborers

The PSLRA's lead plaintiff provision was intended to "ensure[ ] that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers." *In re Party City Sec. Litig.*, 189 F.R.D. 91, 104 (D.N.J. 1999) (citing *In re Donnkenny Inc. Sec. Litig.*, 171 F.R.D. 156, 157 (S.D.N.Y. 1997)); *Skwortz v. Crayfish Co., Ltd.*, No. 00-cv-6766 (DAB), 2001 WL 1160745, at *2 (S.D.N.Y. Sept. 28, 2001) ("Congress believed that [the purpose behind the PSLRA] could best be achieved by encouraging institutional investors to serve as lead plaintiffs."); *In re Olsten Corp. Sec. Litig.*, 181 F.R.D. 218, 220-21 (E.D.N.Y. 1998) ("By establishing the presumptive criterion that the most adequate plaintiff is the one who 'has the largest financial interest in the relief sought by the class,' PSLRA §21D(a)(3)(B)(iii)(bb), Congress intended 'to increase the likelihood that institutional investors will serve as lead plaintiffs. . . .'").

Consistent with Congress's intent, courts have frequently recognized that institutional investors are ideally suited to fill the lead plaintiff role. *See, e.g., Strougo v. Brantley Capital Corp.*, 243 F.R.D. 100, 104 (S.D.N.Y. 2007) (movant's "role as an institutional investor with fiduciary responsibilities makes it particularly well suited" to serve as lead plaintiff); *Glauser v. EVCI Center Colls. Holding Corp.*, 236 F.R.D. 184, 188 (S.D.N.Y. 2006) (institutional investor not only had the largest financial interest, but also had in-house attorneys and securities litigation

---

³ Under the FIFO method, sales are offset against the movant's inventory of stock acquisitions, starting with the earliest and moving chronologically forward. Under the alternative LIFO method, sales are offset against the movant's inventory of stock acquisitions, starting with the latest and moving chronologically backward.

experience, and was "precisely the type of sophisticated institutional investor that Congress and this Court have recognized as being ideally suited to control this type of securities class action litigation"); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MD 1529 (LMM), 2005 WL 2126157, at *2 (S.D.N.Y. Sept. 1, 2005) ("In keeping with ... congressional intent, courts consistently appoint pension and retirement funds as lead plaintiffs pursuant to the PSLRA.") (collecting cases).

Alaska Laborers is a public pension fund system with approximately 3200 current and retured members, and net assets of approximately $500 million as of June 2010. As set forth herein, Alaska Laborers is exactly the type of institutional investor-lead plaintiff envisioned by the Congress when it enacted the PSLRA. As such, Alaska Laborers should be appointed as Lead Plaintiff in this action.

### C.     Alaska Laborers Is Qualified Under Rule 23

Alaska Laborers should also be appointed Lead Plaintiff because it "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc); *Albert Fadem Trust v. Citigroup Inc.*, 239 F. Supp. 2d 344, 347 (S.D.N.Y. 2002); *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 294 (E.D.N.Y. 1998); *Juliar v. Sunopta, Inc.*, No. 08 Civ. 933 (PAC), 2009 WL 1955237, at *1 (S.D.N.Y. Jan. 30, 2009).

Of the four prerequisites to class certification, "typicality and adequacy of representation are the only provisions [of Rule 23] relevant to the determination of lead plaintiff under the PSLRA." *Kaplan v. Gelfond*, 240 F.R.D. 88, 94 (S.D.N.Y. 2007) (citation omitted); *see also Juliar*, 2009 WL 1955237, at *1. Furthermore, "at this stage of litigation, only a preliminary showing of typicality and adequacy is required." *Kaplan*, 240 F.R.D. at 94 (*citing In re eSpeed,*

10

*Inc. Sec. Litig.*, 232 F.R.D. 95, 102 (S.D.N.Y. 2005)).[4] As detailed below, Alaska Laborers unquestionably satisfies these requirements.

### 1.  Alaska Laborers' Claims Are Typical of the Class Claims

Alaska Laborers satisfies the typicality requirements of Rule 23. Typicality can be established by showing that the claims of the proposed lead plaintiff "arise from the same conduct from which the other class members' claims and injuries arise." *See Hicks v. Morgan Stanley & Co.*, No. 01-CIV-10071 (HB), 2003 WL 21672085, at *2 (S.D.N.Y. July 16, 2003) ("The typicality requirement is met when the class representative's claim 'arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory.'") (citations omitted); *see also* 1 H. Newberg, *Newberg on Class Actions* § 3.13 (4th ed. 2007) ("When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met regardless of minor variations").

Here, Alaska Laborers' claims are typical of the claims of the members of the proposed class, who also purchased or otherwise acquired ITT common stock at artificially inflated prices during the Class Period and suffered damages after the subsequent market correction. In sum, Alaska Laborers satisfies the typicality requirement because, just like all other class members, it: (1) purchased or otherwise acquired ITT common stock during the applicable period; (2) at prices allegedly inflated by Defendants' materially false and misleading statements and/or

---

[4]     The remaining requirements of Rule 23 relate to the adequacy of the claims themselves and should not enter into the Court's determination of who should serve as lead plaintiff, but rather should be deferred until the lead plaintiff moves for class certification. *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 252 (S.D.N.Y. 2003) ("In fact, a 'wide ranging analysis under Rule 23 is not appropriate [at this initial stage of the litigation] and should be left for consideration of a motion for class certification.'") (quoting *In re Party City Sec. Litig.*, 189 F.R.D. at 106); *see also In re Crayfish Co. Sec. Litig.*, No. 00-cv-6766, 2002 WL 1268013, at *4 (S.D.N.Y. June 6, 2002) (holding that the remaining requirements are not properly considered by the Court until the lead plaintiff moves for class certification).

omissions; and (3) suffered damages when the truth about the Company was subsequently disclosed. *Reimer v. Ambac Fin. Group, Inc.*, No. 08 Civ. 411(NRB), 2008 WL 2073931, at *4 (S.D.N.Y. May 9, 2008) (finding typicality satisfied where lead plaintiff movants purchased "stock during the proposed class period at prices that allegedly were artificially inflated due to [defendants'] alleged misrepresentations and allegedly suffered losses when the misrepresentations came to light and the stock value declined").

Alaska Laborers' claims arise from the same course of conduct as the claims of all other class members: Defendants' misrepresentations of the Company's business and prospects and their failure to disclose the impossibility of continuing their improper recruiting and financial aid practices, and thus sustaining their artificially inflated financial performance and share price, in the future, due to increasing government scrutiny. Like other class members, Alaska Laborers invested in publicly traded ITT securities without essential information as to the likelihood that ITT would lose access to its largest source of revenue, federal financial aid, with the attendant impact on the Company's earnings. Like other class members, Alaska Laborers was harmed when the previously undisclosed and misrepresented information began to be revealed. Alaska Laborers is not subject to any unique or special defenses. Accordingly, its claims are in all respects "typical" of the claims of other class members. Alaska Laborers and all class members therefore have identical, non-competing and non-conflicting interests in establishing Defendants' liability.

### 2. Alaska Laborers Will Fairly and Adequately Represent the Interests of the Class

Rule 23(a)(4) requires that the representative party will "fairly and adequately protect the interests of the Class." The PSLRA directs the Court to limit its inquiry regarding adequacy to: (1) whether there are any conflicts between the interests of the movant and the members of the

class; (2) whether the movant is an adequate representative of the class; (3) whether the interests of the movant are aligned with the members of the class; and (4) whether there is evidence of any antagonism between the interests of the movant and the class. 15 U.S.C. § 78u 4(a)(3)(B)(iii)(I)(cc). Adequate representation will be found if the representative is represented by able and experienced counsel, and the representative has no fundamental conflicts of interest with the interests of the class as a whole. *See Constance Sczesny Trust v. KPMG LLP*, 223 F.R.D. 319, 324 (S.D.N.Y. 2004).

As a sophisticated institutional investor, Alaska Laborers is not merely adequate, it is the paradigmatic investor that Congress wanted to lead securities class actions. *See Xianglin Shi v. Sina Corp.*, No. 05 Civ. 2154 (NRB), 2005 WL 1561438, at *5 (S.D.N.Y. July 1, 2005) ("Because the size and experience of institutional investors can be of significant assistance to the prosecution of the action, a number of courts 'have understood [the PSLRA] to favor large institutional investors' as lead plaintiff.'") (citation omitted); *Ferrari*, 2004 WL 1637053, at *3 (stating that institutional investors are the type of lead plaintiff that Congress wanted to encourage to participate in securities litigation and to exercise control over the selection and actions of plaintiff's counsel); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 264 (3d Cir. 2001) (noting that the legislative intent of the PSLRA is to encourage large institutional investors to serve as lead plaintiff).

Having suffered a significant $1,013,811 FIFO and LIFO loss as a result of the misconduct at ITT, Alaska Laborers has a significant financial interest in the litigation and can be counted on to vigorously pursue recovery for the Class from all culpable parties. As such, the interests of Alaska Laborers are perfectly aligned with those of the Class, and there is no evidence of any antagonism between Alaska Laborers and the Class. In addition, Alaska

Laborers has experience serving as Lead Plaintiff under the PSLRA and understands the importance of having an engaged Lead Plaintiff monitor the litigation and supervise counsel. Alaska Laborers has further demonstrated its adequacy by retaining highly experienced counsel, timely seeking appointment as Lead Plaintiff, and submitting a Certification reflecting its understanding of the obligations owed by the Lead Plaintiff to the Class. *See* Berger Decl. Ex. 1. Thus, Alaska Laborers has the requisite experience and expertise to vigorously represent the Class in leading this action, and has satisfied the adequacy requirement of Rule 23 of the Federal Rules.

### 3. This Court Should Approve Alaska Laborers' Choice of Lead Counsel

The PSLRA vests authority in the Lead Plaintiff to select and retain lead counsel, subject to the Court's approval. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v). Courts should not disturb the lead plaintiff's choice of counsel unless necessary to "protect the interests of the plaintiff class." H.R. Conf. Rep. No. 104-369 (1995), at *35, reprinted in 1995 U.S.C.C.A.N. 730, 734 (1995); s*ee also In re Cavanaugh*, 306 F.3d 726, 734 (9th Cir. 2002) ("Selecting a lawyer in whom a litigant has confidence is an important client prerogative and we will not lightly infer that Congress meant to take away this prerogative from securities plaintiffs. And, indeed, it did not. While the appointment of counsel is made subject to the approval of the court, the Reform Act clearly leaves the choice of class counsel in the hands of the lead plaintiff.").

Alaska Laborers has retained highly-qualified counsel to serve as Lead Counsel for the Class. Grant & Eisenhofer has been lead counsel in several of the largest securities class actions in history, including *In re Tyco International Ltd. Securities Litigation*, MDL No. 02-1335-B, in which a $2.975 billion settlement was achieved on behalf of the class; and *In re Global Crossing, Ltd. Securities & "ERISA" Litigation*, 02 Civ. 910 (S.D.N.Y.), where settlements exceeded $345

million. Most recently, Grant & Eisenhofer resolved securities litigation pending against Marsh & McLennan for $400 million. Grant & Eisenhofer also has experience taking securities class actions to trial, having served as sole lead counsel in *In re Safety-Kleen Bondholders Litigation*, No. 00-CV-1145-17 (D.S.C.), which went to a jury trial and ended in judgments as a matter of law against two of the company's executives for nearly $200 million, and settlements with the remaining defendants shortly before closing arguments. *See* Grant & Eisenhofer Firm Biography (Berger Decl. Ex. 3).

Accordingly, the Court should approve Alaska Laborers' selection of Grant & Eisenhofer as Lead Counsel for the class.

## CONCLUSION

WHEREFORE, for all the aforementioned reasons, Alaska Laborers respectfully requests that the Court (i) appoint Alaska Laborers to serve as Lead Plaintiff for the Class in this action; and (ii) approve Alaska Laborers' selection of Grant & Eisenhofer as Lead Counsel for the Class.

Dated: January 3, 2011
New York, New York

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

By: s/ Daniel L. Berger
Jay W. Eisenhofer
Daniel L. Berger
Deborah A. Elman
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: (646) 722-8500
Fax: (646) 722-8501

*Counsel for Alaska Laborers-Employers Retirement Trust and Proposed Lead Counsel for the Class*